803 So.2d 933 (2001)
STATE of Louisiana
v.
Cedric JACOBS.
No. 99-KA-0991.
Supreme Court of Louisiana.
May 15, 2001.
Opinion Denying Rehearing July 16, 2001.
Dissenting Opinion on Denial of Rehearing July 16, 2001.
*937 Edward R. Greenlee, C. Kevin Hayes, Michael A. Mitchell, Baton Rouge, Marcia A. Widder, Clive Adrian Stafford Smith, New Orleans, Counsel for Applicant.
Richard P. Ieyoub, Attorney General, Monisa L. Thompson, Jesse H. Bankston, Jr., Douglas P. Moreau, District Attorney, Dale R. Lee, John A. Cannon, Baton Rouge, Counsel for Respondent.
LEMMON, Justice.
This is a direct appeal under La. Const. art. V, § 5(D), from a conviction of first degree murder and a sentence of death. The principal issues involve (1) the denial of defendant's objections during voir dire based on the prosecutor's exercise of peremptory challenges that allegedly were racially motivated; (2) prosecutorial misconduct which prevented defendant from presenting exculpatory and impeachment evidence to the jury; and (3) the admission of other crimes evidence during the guilt phase of the trial.[1]

Facts
On November 15, 1994, at approximately 9:45 p.m., Jason Oberling was murdered in the parking lot of a drive-in restaurant.
Before the shooting, a black male wearing a multi-colored, striped polo shirt drove a 1983 blue Cadillac into the parking lot and got out of the car to use the pay telephone. Oberling arrived in his van and made a purchase at the walk-up window. As Oberling was returning to his van, several restaurant employees saw a masked man (who was not the person that had earlier used the telephone) approach the victim with a gun and struggle with him, heard four or five shots, and saw the victim fall beside his van. The employees saw the gunman move quickly through the parking lot and enter the passenger side of the blue Cadillac, which drove off immediately.
Within four minutes, police located the getaway vehicle and initiated a chase, which culminated when the Cadillac crashed into a parked car. Officers pursued the passenger, who was carrying a satchel. With the aid of a K-9 dog, the officers apprehended defendant, who was hiding behind a garage fence, and arrested him. A search of his person yielded $30 in bills, mixed with a gasoline charge receipt signed by "J. Oberling."
Retracing the route of the chase, an officer located a satchel containing a revolver *938 and several bullets, and a black ski mask wrapped inside a plastic bag.[2]
The police traced the Cadillac's registration to Bienville Davis, whose fingerprints were found in the car and on the telephone receiver at the restaurant.[3]
An autopsy report described the cause of death as three gunshot wounds from bullets fired at very close range. A firearms expert tested the bullets removed during the autopsy and traced them ballistically as having been fired from the revolver found in the satchel recovered in the area of the chase that led to defendant's apprehension.
At trial, the defense was based on the theory that defendant, if involved at all, was not the triggerman, and that the fatal shots were fired by a third person who was not defendant or Davis. The jury unanimously found defendant guilty of first degree murder. After trial of the penalty phase, the jury unanimously recommended the death penalty, finding as aggravating circumstances that defendant had been engaged in the perpetration of armed robbery and that the offense was committed in an especially heinous, atrocious, and cruel manner. Defendant then filed this appeal.

Discriminatory Exercise of Peremptory Challenges
Defendant claims that the prosecutor exercised peremptory challenges in a racially discriminatory manner in violation of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).
Under Batson, a defendant objecting to a peremptory challenge must first establish a prima facie case of discrimination by showing facts and relevant circumstances which raise an inference that the prosecutor used the challenges to exclude potential jurors on account of race. The burden of production then shifts to the prosecutor to come forward with a race-neutral explanation for the challenges. The explanation need not be persuasive, or even plausible, and unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered may be deemed race-neutral. Purkett v. Elem, 514 U.S. 765, 767, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995) (per curiam) Purkett, supra. The trial court then must decide whether the defendant has proved purposeful racial discrimination. State v. Collier, 553 So.2d 815, 818 (La.1989). The ultimate burden of persuasion remains on the defendant to prove purposeful discrimination. Id.; Hernandez v. New York, 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991).
The proper inquiry in the final stage of the Batson analysis is whether the defendant's proof, when weighed against the prosecutor's proffered race-neutral reasons, is sufficient to persuade the trial court that such discriminatory intent is present. State v. Hobley, 98-2460, p. 18 (La.12/15/99), 752 So.2d 771, 782. The trial judge's determination of purposeful discrimination rests largely on credibility evaluations, and these findings are entitled to great deference by the reviewing court. Batson, 476 U.S. at 99 n. 21, 106 S.Ct. 1712.

1. Timeliness of Objections

The defense did not object to the prosecutor's use of his first three peremptory challenges against three black females, *939 Cheryl Eaglin, Irma Miller (who had earlier been accepted by the prosecutor), and Denise Garrett. After the prosecutor exercised his fourth peremptory challenge against Stacy Thomas, a black female, the defense raised a Batson objection as to all four peremptory strikes. By that time, however, Eaglin, Miller and Garrett had left the courthouse, having been excused from previous panels (one on the previous day). The prosecutor gave race-neutral reasons as to Thomas only, stating that he did not have his notes in court regarding the other three.
The judge ruled that objections to the first three jurors were untimely since the jurors were no longer "under any instructions" in the case. The judge further noted that he was satisfied, based upon the record and the answers from the other prospective jurors during voir dire examination, that the challenges were not exercised in a discriminatory manner.
The issue of the timeliness of Batson objections is difficult because a pattern of discrimination may not become evident in early stages of voir dire. In State v. Snyder, 98-1078 (La.4/14/99), 750 So.2d 832, the prosecutor strategically accepted one African-American juror early in the jury selection process, arguably to thwart any pattern of discrimination from emerging after his exclusion of all subsequent black jurors, and then backstruck the juror later. Although Snyder's jury was all white, this court in a divided opinion held that the defense waived any Batson objections by failing to lodge the objections timely.
The problem in the instant case, as it was in Snyder, is the ability of the trial judge to fashion a remedy, when the first Batson objection is raised, as to jurors previously excused. Here, defendant contends that since he objected before the jury was empaneled, his Batson claim was preserved, and the trial judge should have held a hearing as to the challenges of Eaglin, Miller and Garrett. Thus, defendant suggests that this court at least should order a remand for the trial court to hold an evidentiary hearing on the reasons for the prosecutor's first three peremptory challenges.
While this remedy, among others, may be available in an appropriate case, the record of voir dire in the present case reveals that the prosecutor's use of peremptory strikes was so clearly justified that our consideration of a remand to determine the existence of discriminatory intent is not warranted.
Eaglin, on her jury questionnaire, expressed sentiments that the death penalty is "wrong unless a person deliberate[ly] has taken someone life without a probable cause." Although stating that "I am all for making someone do the time if they do the crime," she reiterated her preference for a life sentence over the death penalty, especially if the person was under the influence of drugs or alcohol at the time of the killing. She also did not think that the death penalty was appropriate for first offenders. She further admitted that her brother-in-law was killed during a drug deal, that his killer was sentenced to life imprisonment without probation or parole, and that she felt justice was served in that case.
Miller, on her jury questionnaire, wrote, "I feel that the death penalty is warranted on severe, heinous crimes where no chance of rehabilitation is foreseeable for the person committing the crime." Although she attested to some strong religious views, she indicated that she could follow the law. She admitted that her twenty-seven-year old son was convicted of receiving stolen goods and that she visits him in prison regularly. See State v. Lindsey, 543 So.2d 886 (La. *940 1989) (considering the fact that a family member is a convicted criminal to be a racially-neutral reason for excluding a prospective juror).
Miller also confirmed that she has visited a former schoolmate who is in prison for murdering a store owner during a robbery. She stated she had two brothers who are pastors and one brother who was shot to death in 1970, but no one had been convicted of that crime.
Garrett, during voir dire, elaborated on her feelings about capital punishment:
Okay. I feel it is appropriate if the person that's up on trial, all the evidence and everything is in, and they are, you know, under no circumstances they are found guilty; all the evidence is right there, then I'm for it. But if there's any question in mind, I'm against it.
When the prosecutor told the panel he was asking them to order defendant to be strapped on a gurney and injected with death-causing material, Garrett reacted visibly, according to the prosecutor. She then explained, "I would still be for it, butI'm kind of on both sides, put it like that."
Garrett admitted that her brother was presently incarcerated on an armed robbery conviction, that he had been "in and out of jail," and that she had visited him regularly in prison. Garrett also stated that she had been the victim of a robbery while she was employed at a convenience store and that she had been successful in personally turning around some troubled young people.
Based on the totality of the responses and the trial judge's observation that the three challenges were not exercised in a discriminating manner, we conclude that the prosecutor was justified in striking these jurors.

2. Application of Batson Standards

Defendant argues the trial judge used a flawed Batson procedure, stating that race-neutral reasons existed in the record of voir dire and then allowing the prosecutor an opportunity to respond with his own explanations, after which the judge "rubber stamped" his initial decision and overruled the Batson objection. Furthermore, defendant claims that the trial judge assumed the role of the prosecutor by occasionally proffering his own reasons to justify the prosecutor's strikes, supplementing the record with his own assessment of possible race-neutral reasons, rather than requiring the prosecutor to articulate the purported bases for the strikes.
The Court in Batson declined "to formulate particular procedures" required to prove discriminatory purpose and left the determination of the necessary quantum of proof for the trial courts. In State v. Green, 94-0887 (La.5/22/95), 655 So.2d 272, 287-88, this court held that the sole focus of the Batson inquiry is upon the intent of the prosecutor at the time of exercising peremptory strikes and outlined several factors to be considered in determining whether the defense established discriminatory purpose:
The defendant may offer any facts relevant to the question of the prosecutor's discriminatory intent to satisfy this burden. Such facts include, but are not limited to, a pattern of strikes by a prosecutor against members of a suspect class, statements or actions of the prosecutor which support an inference that the exercise of peremptory strikes was motivated by impermissible considerations, the composition of the venire and of the jury finally empaneled, and any other disparate impact upon the suspect class which is alleged to be the victim of *941 purposeful discrimination. See State v. Collier, 553 So.2d 815 (La.1989).
In the present case, defendant points out, in support of his establishing a prima facie case in the first step of the Batson procedure, that the prosecutor used all but one of the ten peremptory challenges[4] he exercised, plus both of his alternate peremptory challenges, to remove black members of the venire, although African-Americans comprised only about thirty-five percent of the qualified venire, while using only ten percent of his strikes to remove non-blacks, although sixty-five percent of the qualified venire was nonblack. Defendant emphasizes that the prosecutor struck all but two of the African-American venirepersons remaining in the jury pool after cause challenges had been made, one of whom was removed by a defense peremptory challenge and one of whom served on the jury.[5]
The trial judge may not have strictly adhered to the first step outlined in Batson, but his overall application of the Batson standards was fair in light of the decision in Hernandez v. New York, 500 U.S. 352, 359, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991), which held that the issue of whether the defendant has established a prima facie case becomes moot if the court requires, and the prosecutor responds, with his race-neutral reasons for excusing the prospective jurors. A trial judge may therefore effectively collapse the first two stages of the Batson procedure, whether or not the defendant established a prima facie case of purposeful discrimination, and may then perform the critical third step of weighing the defendant's proof and the prosecutor's race-neutral reasons to determine discriminatory intent. The judge in this case did not commit reversible error in his handling of the first two steps of the Batson procedure.

3. Determination of Discriminatory Intent

Defendant argues that he proved discriminatory intent in the final six peremptory challenges made by the prosecutor, when the proffered race-neutral reasons are weighed against the totality of the circumstances discussed above. We review each juror individually.
Stacy Thomas: Thomas was the prosecutor's fourth peremptory challenge and the fourth African-American excused by the prosecutor, who gave the following reasons:
Regarding Ms. Thomas, she said, and I quote, I am not here to judge. She said that twice. And that's the main reason I'm excusing her. Also, she showed a lack of interest. You may have noted, your honor, that I stopped reading the second degree murder statute, and I did that to get her attention. Also, she has trouble returning the death penalty if someone is sorry. It seems to me like any person who is convicted of first degree murder would be sorry that he did it, and I'm very concerned about that. I think she was very weak on the death penalty, and I excused her for those reasons, but mainly her repeated statements that she is not here to judge because that's what jurors have to do is judge.
The judge accepted Thomas' lack of attention, her inability to judge, and her *942 weakness on the death penalty as race-neutral reasons for her dismissal. As noted above, the trial judge's determination of purposeful discrimination, resting largely on credibility evaluations, is entitled to great deference by the reviewing court, and we perceive no abuse of discretion.
Lois Copeland: Copeland was the sixth person challenged peremptorily by the prosecutor.[6] In her voir dire responses, she elaborated that, even after sitting and listening to other prospective jurors:
I still don't know how I feel about it.... You can tell, I'm confused right now. I don't know. I'm notI guess I'm maybe one of these people who sit back and hope that God will make all the right decisions for everybody, you know. But you're asking me right now, Lois Copeland, how do you feel about the death penalty, I can't answer it; I can't answer that question. I don't know.... I don't know; I don't know. I'm not for it, I'm not against it. I'm just in the middle.
Much later, Copeland was still ambivalent about the death penalty:
I hate that question. I mean, I don't know what to tell you. I don't know. I have searched my mind trying to think of maybeI'm Catholic, you've read that on theretrying to think of my religious beliefs. But there's nothing that stands out right now that can tell me that I can be impartial one way or the other about the death penalty at this point and time. So, I guess that's not an answer to your question, but that's all I have for you. If you ask me that question ten minutes from now, I will probably give you the same answer.
When asked to articulate race-neutral reasons for striking Copeland, the prosecutor responded that "this is an obviously intelligent person who was totally unable to explain her opinions on the death penalty." Based on Copeland's inability to explain her position on the death penalty, the trial judge properly accepted the prosecutor's justification for excusing her from service on a capital case.
Tracy Moton: Moton, a twenty-two-year-old single mother of a seven-week-old infant, was the seventh juror excused peremptorily by the prosecutor. Although she did not raise her hand when her panel was asked whether anyone had an undue hardship, she was brought into the courtroom for questioning about hardship, outside the presence of the other prospective jurors. Initially, her voir dire responses suggested that jury service would pose a hardship for her because of her baby, but then her tone shifted to indicate that she would have no concerns about leaving her infant in the care of others while she served on a sequestered jury:
Q. [by the court] Do you feel that because of this very young child that you have the lack of anyone to care for her, that this would pose an undue hardship or extreme inconvenience on both you and your child if you had to serve on this jury?
A. No, not really; I don't think so.
Q. That's a little different from what you were telling me. You were telling me earlier that it would cause a hardship?
A. Yes, but I was saying that if I had to do the jury duty, I would try to find somebody to keep it.
Q. All right. That's not what I heard you say earlier. Will somebody be able to keep this child for you if you are on the jury?

*943 A. My mother would try to get off work in time if she had to. That's what I'm saying, if she had to do it, she would get the people at work to let her off early enough so she could come home and keep him while my sister have him in the day time or something, a little while in the day.
Q. So you're telling me you could make family arrangements?
A. Yes.
Q. To care for your child?
A. Yes, because my mom, even though she doesn't have a certain time to get off, like last night she worked until like eight o'clock, she would push herself to get off earlier so she could come home.
Q. And she could do that for a week or perhaps up to two weeks?
A. Yes.
Q. And you're not asking to be excused from this jury because of a hardship that it would cause you or your daughter or your son or your family?
A. No.
Q. Okay. And you could serve on this jury?
A. Yes.
The prosecutor then questioned Moton about whether she understood the ramifications of being on a sequestered jury:
Q. I want to make sure you understand that if you're selected to serve on a jury what will happen. Once all the jurors are together that you won't be going home at all during that period.
A. Right.
Q. You would be able to call on the phone, to be monitored by a sheriff's deputy?
A. Right.
Q. But you're not going to be visiting with them, and they can't be visiting with you during that period. We can't be exactly sure how long it will last, but it could be in the neighborhood of a week?
A. Right.
Q. Do you think that your separation from your six week, seven week old child would cause you particular difficulty in listening to the evidence in connection with this case, or would you be concerned about the care of that particular infant.
A. Well, this is my first, so I probably would be concerned because I'm new at this. This is my first time being a mom or whatever. But if I had to do it, I would.
Q. We understand that. The question we have is, it's a hardship for anyone to serve upon a jury. We recognize that. And it's more of a hardship to serve upon a jury which is put in a hotel. Because of the child, that's why we brought you in. Is that a particular hardship for you, that separation for your child, and having other people care for a child at such a tender age?
A. No.
In justifying his exercise of a peremptory challenge to excuse Moton, the prosecutor explained:
One of the things we do in criminal trials is hold people responsible for their own actions, whether it be in a murder trial or a burglary, an escape, a rape, whatever the case may be. And in doing that, especially in a first degree murder case, the juror's attitude towards responsibilities, in taking responsibilities for their own actions and what they do, is vitally important. In this case, we have an individual who is a single mother that apparently has no sense of responsibility *944 to an infant child, which I think personally is shocking; that she is willing to let another family member, not the mother of the child who is only seven weeks old, care for the child, that she is willing to abandon the child and go stay in a hotel, locked up and sequestered. It's shocking. It shows an utter[] lack of any type of concern or responsibility toward an infant, a complete rejection of what I think is important, an important parenting skill, a responsibility that we assume when we have our own children. This inability to assume responsibility toward her own child is shocking in connection with this case. If she can't assume responsibility for her own child, how can I possibly believe she could hold this man responsible for his actions.
Defendant argues that the explanation was "patently racist (and sexist), as it calls forth the stereotype that young, single black mothers are poor, uncaring parents." Citing State v. Hobley, 98-2460, p. 20 (La.12/15/99), 752 So.2d 771, 783, defendant contends that a more exacting scrutiny is required when cultural classifications may serve as a proxy for an impermissible classification.
Here, the prosecutor did not single out Moton's ethnicity as a basis for excusing her, but rather inquired strongly into the effect on her jury service of having a seven-week old child at home. There is no indication in the voir dire, as a whole, that race dictated the prosecutor's decision to strike Moton.[7] The judge did not abuse his discretion in accepting the prosecutor's explanation.
Faye Thomas: Thomas, the eighth juror excused peremptorily by the prosecutor, expressed agreement with the death penalty. However, the factor that caused the prosecutor concern was that her husband had been employed for fourteen years as a corrections officer at a state institution. In excusing Thomas, the prosecutor explained:
Your honor, every single juror I have asked about a couple of issues. I asked when this questionnaire was prepared that we add specifically some limited issues about, have you ever been arrested, ever had family members arrested, ever been to a jail, had contact with a jail. That was done for a particular reason, because I don't want to have people who have close contact, who visit jails often, who have that type of association. And in this case, we have her husband who works at LTI. And I don't want to have people who have that close contact with a prison environment serving upon this case because they bring with it necessarily knowledge about what prisons are like. They bring the lifestyle which can't be considered in argument by me. I can't even talk about it. I am seeking the death penalty here, not merely incarceration. And because of the involvement of her husband, I see that as a potential problem here because I want a death sentence. That's why I'm excusing her, because of her husband's involvement. Her husband has worked for fourteen years and never had a problem with any prisoner. That seems just kind of hard to believe also.
Defendant argues that the prosecutor's stated reasons for striking Thomas, i.e., that he did not want people who have close contact with a prison environment, were pretextual. Defendant points out that the *945 prosecutor did not challenge Mark Vignes, who worked at Hunt Correctional Center, and Z.C. Dunaway, who visited Angola and the prison at Jackson in connection with his Lion's Club affiliation and church-related activities. However, this court previously opined:
[T]he fact that a prosecutor excuses one person with a particular characteristic... and not another similarly situated person does not in itself show that a prosecutor's explanation was a mere pretext for discrimination. The accepted juror may have exhibited traits which the prosecutor could have reasonably believed would make him desirable as a juror.
State v. Collier, 553 So.2d 815, 822 (La. 1989).
Examining the voir dire as a whole, we note that Vignes's connection with the prison system was through his employment as a horticulturist, and Dunaway's connection was even more attenuated in that his visits were several years earlier through the Lions Club and his church. We conclude the trial judge did not abuse his discretion in finding the prosecutor's reasons non-pretextual.
Fred R. Norwood, Jr.: The prosecutor used his ninth peremptory challenge to strike Norwood, a thirty-five-year old African-American male. On his questionnaire, Norwood stated that he believed in the death penalty unless the killing was in self-defense.
Although many of Norwood's voir dire responses tended to indicate he might have been a juror favorable to the state, the prosecutor articulated the following reasons for excusing him:
We are trying a murder case here, a homicide. This [juror] had a brother who has been convicted of murder really manslaughterand served a period of confinement. He visited him in parish prison and a state institution. This is not the kind of person I think would be leaning in favor of convicting an individual for another homicide. Clearly he leans, because of his prior contact with his brother, [in] favor of the defense. I think I am entitled to try to get jurors who lean in favor of the state, and that's why I'm excusing him.
This court has considered the fact that a family member is a convicted criminal to be a race-neutral reason for excluding a prospective juror. See State v. Lindsey, 543 So.2d 886 (La.1989). Thus, the trial judge properly ruled that the striking of Norwood was not based on discriminatory intent.
Andrew Gilmore: The state used its tenth peremptory challenge to excuse Gilmore. When asked his feelings on the death penalty, he wrote: "If you make your bed hard, lay in it." After responding that a murder occurring during an aggravated rape is "one certain incident that I would feel that the death penalty should be carried out," he wavered and could not commit if the situation was a murder during an armed robbery:
Q. Do you have any problem considering the returning of a death sentence for someone who killed during a robbery?
A. That's a hard question to answer because of so many circumstances and so many things that happen.
When the prosecutor was trying to make the point that the state's burden is to prove the elements of the crime, Gilmore again expressed confusion:
Q. Do you understand I'm only required to prove those elements, nothing else?
. . .
A. That's a hard question to answer.

*946 Q. Why is it a hard question to answer?
A. Because like as you were saying, you have the person who did the crime or who was in the area of the crime, so to speak.
Q. They must be a principal, not just in the area?
A. Right. He was a principal, if it was stated he was the actual one who did it, and all the facts, you have to have facts to judge, because he could have been the one in the getaway car, and the getaway car was just a car that dropped some people off, and he didn't know nothing about it. It's kind of hard to say.
The prosecutor articulated the following reasons in response to the Batson objection:
There are two main reasons I'm excluding him. One deals with the guilt phase, and one with the penalty phase. In response to defense questions, the potential juror said he wanted to know why the defendant shot in an armed robbery, that that was very important to him. This juror brought up the fact about whether there would be a struggle over the weapon. In this case, your honor, the facts of this case, there's going to be a shot, a struggle, and multiple shots. Based upon the particular facts of this case, and in view of what he said, it would be very important to him, I think in the penalty phase especially, he is very beneficial to the defense. Also, in the second area, that I think he is one of these people who no proof would ever be enough to convict someone of a crime. He repeatedly talked about facts, circumstances and giving a fair chance to the defendant. Even in response to questioning by me concerning proof beyond a reasonable doubt, when I said this is a given, that I prove beyond a reasonable doubt, he was still concerned about the facts of the case. He is an extremely defense oriented person in view of his responses. But again, most importantly, I'm concerned about the unique facts of this case, there's a shot, struggle, multiple shots.
The prospective juror's voir dire responses as a whole reveal that the prosecutor correctly read Gilmore's demeanor for indefiniteness. In light of Gilmore's responses, the prosecutor was justified in exercising a peremptory strike.

Prosecutorial Misconduct
Defendant asserts that prosecutorial misconduct throughout the course of these proceedings prevented the defense from discovering and presenting proof of defendant's innocence and from challenging the reliability of the state's evidence. These assertions formed the basis of defendant's motion for new trial based on newly discovered evidence, filed in this court pursuant to La.Code Crim. Proc. arts. 851(3) and 853.[8]

1. The Unavailability of Bienville Davis

Defendant claims that the prosecutor rendered Bienville Davis unavailable to him as a defense witness by holding open against Davis the charge of accessory after the fact. According to the defense, the prosecutor never intended to pursue the charge and took advantage of the charge to intimidate Davis during defendant's trial and render him unavailable.[9]
*947 In the motion for new trial, defense counsel stated by affidavit that Davis' attorney would not allow Davis to speak to him while the charges against Davis were still pending. Counsel further asserted that Davis has now implicated a third person, Sherman Reed, as the shooter[10] and that the prosecutor's actions prevented him from presenting Davis as a witness in his defense, in violation of the rule of Chambers v. Mississippi, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973).
Defense counsel presented the defense that defendant was not the triggerman and argued to the jury that the state's evidence did not exclude the reasonable hypothesis that a third person (neither defendant nor Davis) was the murderer. Counsel played for the jury an audio tape of the police chase which occurred immediately after the shooting, on which an officer was heard to say, "We've got another black male that's headed south behind the apartments going towards Oleander, all dark clothing." In closing argument, defense counsel theorized that the police allowed the escape of the real killer, whom the police missed when the two suspects bailed out of the blue Cadillac.
While Davis' testimony possibly may have aided defendant's case,[11] it was not indispensable to the third party gunman defense, which was presented principally to challenge the sufficiency of the state's evidence. Moreover, defendant's right to call Davis as a witness had to yield to Davis's Fifth Amendment right against self-incrimination, whether or not an indictment was still pending. This court, when faced with resolving the tension between a witness's Fifth Amendment privilege against self-incrimination and a defendant's Sixth Amendment right to present a defense, has consistently favored the witness' right not to incriminate himself. State v. Brown, 514 So.2d 99, 108-12 (La.1987). Defendant's right in this case to compel Davis to testify was not absolute. Brown, supra.
Finally, the evidence proffered in support of the new trial motion evidence does not meet the criteria in La.Code Crim. Proc. art. 851(3) for granting a new trial on the basis of newly discovered evidence, i.e., that "[n]ew and material evidence [exists] that, notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before or during the trial, is available, and [that] if the evidence had been introduced at the trial it would probably have changed the verdict or judgment of guilty." La.Code Crim. Proc. art. 854(1); State v. Cavalier, 96-3052, p. 3 (La.10/31/97), 701 So.2d 949, 951.
Courts treat with "great skepticism" belated exculpatory evidence provided by codefendants who have resolved their own cases after the defendant's conviction. Generally, such evidence is not a sufficient ground for granting a new trial. State v. Perique, 340 So.2d 1369, 1377 (La.1976).
In the present case, the third party gunman theory was known, presented as evidence, and argued to the jury at defendant's trial, and the defense knew that Davis could have provided evidence on this issue. Furthermore, the scenario now apparently espoused by Davis is so completely at odds with the other evidence that *948 counsel cannot fairly describe it as material enough to the issues of guilt and punishment at trial that it warrants consideration by a second jury.[12]

2. Suppression of Exculpatory and Impeachment Evidence

Defendant contends that the prosecutor did not adequately respond to discovery requests and failed to provide exculpatory and impeaching evidence which would have supported his theory that a third person committed the crime.
In Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the Court held that the suppression by the prosecution of evidence favorable to the accused, when requested, violates the defendant's due process rights, if the evidence is material either to guilt or punishment, without regard to the good or bad faith of the prosecution. The Brady rule encompasses evidence which impeaches the testimony of a witness when the reliability or credibility of that witness may be determinative of guilt or innocence. United States v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); State v. Knapper, 579 So.2d 956, 959 (La.1991). However, Brady and its progeny do not establish a general rule of discoverability. A prosecutor does not breach his constitutional duty to disclose favorable evidence "unless the omission is of sufficient significance to result in the denial of the defendant's right to a fair trial." United States v. Agurs, 427 U.S. 97, 112, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); State v. Willie, 410 So.2d 1019, 1030 (La.1982).
For purposes of Brady's due process rule, a reviewing court, in determining materiality of evidence, must ascertain "not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Kyles v. Whitley, 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (citing Bagley, 473 U.S. at 678, 105 S.Ct. 3375). Thus, the reviewing court does not put the evidence to an outcome-determinative test in which the court weighs the probabilities that the defendant would have obtained an acquittal at trial or might do so at a second trial. Instead, a Brady violation occurs when the "evidentiary suppression `undermines confidence in the outcome of the trial.'" Kyles, 514 U.S. at 434, 115 S.Ct. 1555 (quoting Bagley, 473 U.S. at 678, 105 S.Ct. 3375).
Since defendant's trial, his appellate counsel has obtained copies of supplemental police reports that counsel asserts contain exculpatory and impeachment evidence that should have been disclosed and is material to the third party gunman defense. Separate discussions follow.

a. Evidence of a Third Person's Involvement

Defendant points first to a supplemental police report detailing the pursuit of the blue Cadillac after the shooting. In that report, the officer wrote that he "observed two (2) black male subjects exit the vehicle while the vehicle was still in motion," *949 before it rolled into a parked car. The report goes on:
Ofc. observed passenger as: fair complexioned male, checked shirt, dark pants with a bag on his hand exit the vehicle and run North on 17th and run under an illuminated street light. Ofc. observed driver as: black male, 5' 6" to 5' 7", medium build, blue or dark shirt and pants run South through vacant area toward Blanch Court. (emphasis added).
Defendant now claims that the officer's clothing description of the driver is inconsistent with that of the witnesses, who described the driver's shirt as a multicolored, striped, polo shirt. Defendant suggests that the officer's description of the driver matches the description given by the witnesses of the masked gunman, i.e., all dark clothing.[13] Ignoring the "two (2) black males" portion of the report, defendant interprets the report as supporting his theory of a third party gunman.
The report does no more than show the subjectivity of perceptions. The officer's description of the passenger's clothing matches identically with the photographs of defendant taken upon his arrest. Nothing in this report can be remotely construed as supporting a third party gunman theory, and the discrepancies pointed out by defendant do not rise to a level of lessening confidence in the verdict.
A second supplemental report pointed to by defendant stated: "Ofc. spoke with Church's Chicken employees who advised ofc. that they had seen two b/m's in the parking lot prior to the shooting and had seen a b/m wearing a ski mask." The officer who authored the report was not called to testify by either side.
This report does not establish that there were three participants in the robbery; rather, the report merely states that two black males were seen before the shooting and that a black male wearing a ski mask was seen at one point. There are no discrepancies that rise to a level of lessening confidence in the verdict.

b. Evidence Regarding the Receipt Bearing the Victim's Signature

Defendant contends that the police "planted" the receipt signed by the victim on defendant at his arrest.
At trial, the prosecutor methodically established that no officer could have planted this key piece of evidence, which was mixed in with the paper currency seized from defendant at the arrest scene, because no officer had yet been to the murder scene where the incriminating evidence could have been retrieved. Defendant seeks support in Kyles dicta:
"[w]hen ... probative force of evidence depends on the circumstances in which it was obtained and those circumstances raise a possibility of fraud, indications of conscientious police work will enhance probative force and slovenly work will diminish it."
Kyles, 514 U.S. at 446 n. 15, 115 S.Ct. 1555.
Defendant now claims that he obtained supplementary reports, after trial, which suggest that an officer left the scene of the car crash immediately after defendant was apprehended and went to the murder scene before photographs of the contents of defendant's pockets were taken. From this, defendant theorizes that the contents of his pockets were not immediately *950 photographed following his arrest, and that the state elicited perjured testimony from the officer to establish that no one had tampered with this evidence.
A fair reading of the supplemental reports reveals no contradiction between them and the officers' testimony.[14] Five officers testified that the seizure of evidence from defendant occurred before any of them went to the murder scene, and defendant has not presented any evidence to contradict this testimony. Therefore, there was no exculpatory or impeaching evidence requiring disclosure to the defense revealed in the reports.

c. Additional Impeachment Evidence

Lastly, defendant asserts that the prosecutor failed to disclose prior inconsistent statements made by eyewitness Emelie Konopka. Defendant claims that "newly discovered" police records suggest that significant portions of the witness' testimony was fabricated.
Specifically, defendant questions Konopka's perception of the events surrounding the shooting because of a discrepancy as to whether she was seated in her car or standing outside the car in the parking lot when the murder occurred.
Under cross-examination at trial, the witness stated:
Q. Were you sitting inside your husband's car at this time, when this happened?
A. In the very early stages I was sitting in his vehicle. At the time of the actual shooting, I was not in the vehicle, I was standing outside.
A supplemental police report, obtained after trial, stated: "Witness also wanted to make it known that her estimation of the height of the accused could be off since where she was seated is lower than the parking lot of Church's Chicken."
There was no inconsistent information to disclose prior to trial, and the witness at trial explained her location at the precise time of the shooting. The information in the report does not create an inconsistency that lessens confidence in the verdict.
In the same report, Konopka described what appeared to be a dark cloth hat on the assailant's head, whereas she identified the assailant at trial as wearing a ski mask. Importantly, Konopka was a witness in the civil suit brought by the victim's family against the fast food restaurant. Defense counsel was present at her deposition and gained a significant amount of discovery information.
At defendant's trial, defense counsel throughout his cross-examination of Konopka referred to her civil deposition and asked her to refresh her recollection with that testimony. On redirect, the prosecutor directed Ms. Konopka to the statement that she gave to police four days after the murder:
Q. And you were asked specifically about the mask and you described it as what?
A. I saw his side and back and it appeared to be like maybe a snowtype of snow hat or something like that.
Q. And so you were saying this four days after the crime?
A. Yes.
A review of the trial record, the state's discovery answers, and the police reports obtained by the defense after the trial does not reveal that there was any exculpatory or impeaching evidence, not *951 disclosed to the defense, that would undermine confidence in the outcome of the trial.

Unadjudicated Other Crimes Evidence
Defendant contests the admission of evidence of an unadjudicated purse snatching in the guilt phase.
Generally, evidence of other acts of misconduct is not admissible because it creates the risk that the defendant will be convicted of the present offense simply because the unrelated evidence establishes him or her as a "bad person." La.Code Evid. art. 404B(1); State v. Jackson, 625 So.2d 146, 148 (La.1993). This rule of exclusion stems from the "substantial risk of grave prejudice to the defendant" from the introduction of evidence regarding his or her unrelated criminal acts. State v. Prieur, 277 So.2d 126, 128 (La.1973). However, evidence of other crimes may be admissible if the state establishes an independent and relevant reason, i.e., to show motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding. La.Code Evid. art. 404B(1). Even when the other crimes evidence is offered for a purpose allowed under Article 404, the evidence is not admissible unless it tends to prove a material fact at issue or to rebut a defense. The probative value of the extraneous crimes evidence must outweigh its prejudicial effect. La.Code Evid. art. 403; State v. Hatcher, 372 So.2d 1024, 1033 (La.1979).
At the pretrial Prieur hearing in the present case, Linda Mayes testified that she was robbed outside of a bank as she was on her way to make a deposit for her employer. A black male approached, wrested the deposit bag from her, and reentered the passenger side of a blue Cadillac as it drove off. She positively identified defendant as the perpetrator, and the police identified the license plate on the blue Cadillac as belonging to Bienville Davis.
Defense counsel argues that the evidence (1) did not establish an independent and relevant reason for admission and (2) was not proved by clear and convincing evidence.
In the Prieur notice, the prosecutor postulated that the purse snatching robbery should be admitted to show intent, motive and identity in the robbery and murder of Oberling fifteen days later, asserting that the common link between the two events was the 1983 blue Cadillac registered to Bienville Davis.
After the Prieur hearing, the prosecutor outlined the similarities between the two events:
The evidence regarding the City National case and the Church's are very similar. They are 15 days apart. Both occur upon weekdays, one upon a Monday, the other upon a Tuesday. The court is aware of the relative locations of these two, and for appellate purposes that is in the record. Both of these occurred in a parking lot. Both of these cases, the robber[ ] was a passenger exiting the front passenger seat. Both were from a blue Cadillac with the exact same Louisiana license plate. The registered owner of that vehicle is Bienville Davis who's also know as Bienville Mosby, who was also arrested in connection with the Church's case. In both cases, the robber was acting alone.... In both cases there were completed crimes. The crimes were completed. Items were taken from each victim. In each case the Cadillac was used as the getaway vehicle. In each of the two cases money was taken. Also, in each of the two cases, items were discarded shortly after the robbery. Regarding the City *952 National Bank, you've heard about the items discarded on Highland. Regarding the Church's robbery, items were discarded on Claycut. In the case of City National Bank, the victim in that case has been shown a photographic display and picked out the robber, who happens to be the defendant in connection with this case. Regarding the identity regarding the second case, the defendant was found in possession of items, fruits of the crime, less than half an hour after crime.
Defendant points out distinctions between the two crimes in that the Mayes robber was unmasked and unarmed and committed his crime during daylight hours, whereas the Oberling perpetrator wore a mask, was armed, and struck after dark. Further, defendant noted that Mayes was unhurt, whereas Oberling was killed.
Without stating the specific independent reason for admissibility, the trial court ruled the other crimes evidence could be admitted at trial.
The other crimes evidence was admissible to prove a consequential fact truly at issue in the case. See State v. Frederick, 340 So.2d 1353, 1356 (La.1976). The evidence was highly probative in rebutting the primary defense of misidentification of defendant as the triggerman. Prieur, 277 So.2d at 130. Because the person who shot Oberling wore a ski mask to conceal his face, identity was the key issue. Evidence of the Mayes robbery was clearly relevant to the issue of the identity of the shooter because it bolstered the state's circumstantial hypothesis that defendant worked the front end of a criminal partnership involving at least one other person and using Davis's car (with Davis likely at the wheel on both occasions) as the getaway vehicle. The Mayes incident therefore helped jurors evaluate the possibility of whether a third person actually shot the victim and then gave defendant the proceeds of the robbery, including the tell-tale gasoline receipt, in the brief chase with the police before the perpetrators abandoned Davis's blue Cadillac. The evidence was also relevant to the jury's consideration of the possibility that the police may have planted the evidence on defendant to frame him for Oberling's death. The trial court therefore did not err in ruling that the evidence was admissible under Articles 403 and 404.
We further conclude that the state proved defendant's connection with the earlier crime by clear and convincing evidence.[15]
Immediately after Mayes was robbed in broad daylight, she gave police a description of the robber as a black male, five feet ten inches tall, medium build, mid-to-late twenties, dark complexioned, with his hair in a geri curl, and not wearing any type of facial disguise. She also described the robber's clothing and estimated that her face-to-face encounter with her attacker lasted between thirty and sixty seconds. Eighteen days after the robbery, Mayes viewed a photographic lineup and positively identified defendant as the person who robbed her.
At the Prieur hearing, Mayes acknowledged that she may have seen a profile picture of defendant in the newspaper report of his arrest in the Oberling murder, before she made her identification, but she denied that the newspaper photograph influenced *953 her in any way. She expressed the utmost confidence in her selection, and she again positively identified defendant in court at the Prieur hearing as the person who robbed her.
Defendant further claims that Mayes' attention was unduly drawn to his photograph because his was the only photograph in the six-picture lineup with a patterned background. According to defendant, the five fill-in photographs all had a solid white background, whereas he was photographed in front of a checkered background. Counsel interrogated Mayes on this subject, and she stated that she had not even noticed the background of the photographs.
Based on the totality of the circumstances, defendant's commission of the Mayes' robbery was proved by clear and convincing evidence, and there was no substantial likelihood of misidentification.
Finally, defendant asserts that supplemental reports of the Mayes robbery, which he claims were wrongfully withheld prior to trial, demonstrate that the crime was committed by someone other than him. Mayes described the perpetrator as a dark-complexioned black male, whereas defendant describes himself as a light-skinned black male. The supplemental reports show that two other witnesses to the Mayes robbery described the assailant as "dark in skin tone" and "brown skin tone."
However, Mayes's description of defendant's complexion was disclosed to the defense. She was cross-examined thoroughly on this point at the Prieur hearing and at trial. She was unequivocal in her identification of defendant as the person who robbed her and then fled in a blue Cadillac registered to Bienville Davis.
We conclude that the admission of the evidence of the Mayes robbery did not constitute reversible error.

Capital Sentence Review
Under La.Code Crim.Proc. art. 905.9 and La.S.Ct.R. 28, this court reviews every sentence of death to determine if it is constitutionally excessive. In making this determination, the court considers whether the jury imposed the sentence under the influence of passion, prejudice or other arbitrary factors; whether the evidence supports the jury's findings with respect to a statutory aggravating circumstance; and whether the sentence is disproportionate, considering both the offense and the offender.
Defendant is a black male born on August 16, 1963 in Independence, Louisiana and raised in Baton Rouge. He was the child of the non-marital union between Betty Howard, age fifteen, and Theodore Jacobs, age thirty-five, who was married to someone else. His mother dropped out of school when she became pregnant and continued to live with her parents, but her mother died two months before defendant was born. Defendant's aunt raised him until he was about four years old. Defendant's father worked as a cement finisher and provided support and relatively consistent attention to approximately twelve children that he fathered, until his death in 1974.
During defendant's early childhood, his mother married Andrew Patin, and a half-brother was born of this union, which lasted four years. Thereafter, the mother and her sons moved into a low-income housing project. Defendant also has one other half-brother, who was born of another non-marital union. At the time of defendant's trial, one half-brother was serving a life sentence for second degree murder, and the other was on supervised probation for *954 felony theft, aggravated escape and aggravated battery.
Defendant completed the ninth grade and displayed athletic abilities. His coach testified in the penalty phase of his trial. However, around age ten, he began having behavioral problems at school and home, with instances of running away. He was also "abused" by a male babysitter.
Shortly after his father's death, defendant was committed to an institution for "ungovernable behavior." Upon release, he went to live with his aunt, but shortly thereafter was charged with purse snatching. In 1978, he was sent to Louisiana Training Institute in Monroe. There, psychological testing indicated an IQ score of 78, a chronological age of 15.4 years, and a mental age of 10.4 years.
Substance abuse problems with alcohol, marijuana and cocaine recurred throughout defendant's late adolescence and adulthood. In 1988, he was hospitalized for ingesting some "bad cocaine." In 1990, he entered a detoxification center in an attempt to deal with his chemical dependency problems. In 1991, he attempted suicide and was committed to a hospital for several weeks.
Defendant was thirty-one years old at the time of the present crime. Upon incarceration, he was diagnosed as suffering from psychotic depression and polysubstance dependence, and was placed on psychotropic medications.
In August, 1997, two doctors appointed to a sanity commission conducted mental examinations. After a hearing, the trial court found defendant competent to proceed to trial.
Defendant was never married, but had two children, who were ages fourteen and sixteen at the time of trial. Defendant has never had any real contact with his children, nor has he ever supported them.
Defendant's employment history was sporadic. He left high school and went to work at a furniture store for approximately one year. In 1983, he was briefly employed at an automobile dealership. Defendant moved to California and worked briefly for a civilian conservation corps project until May 1985. In 1990 and 1991, defendant worked as a tank cleaner at a shipyard, and also was employed intermittently by a bail bond company. Beginning in 1992, he worked for his uncle's janitorial service "off and on" for about two years.
Defendant has spent the majority of his adult life incarcerated. He stated that his criminal problems, beginning when he was around ten or eleven years old, were attributable to his "poor environment." By his own admission, defendant supported himself most of his life with criminal activity, such as dealing drugs and committing robberies.
At the penalty phase of trial, the state presented evidence that defendant has the following adult convictions: (1) 1982five counts of simple burglary; (2) 1989carnal knowledge of a juvenile and unauthorized entry of an inhabited dwelling; (3) 1989simple burglary of an inhabited dwelling; (4) 1993possession of cocaine; (5) 1993simple burglary; (6) 1993-simple robbery; (7) 1993-three counts of burglary in Kansas. He was on probation at the time of the instant offense.
Since his present incarceration, he has committed various infractions and has been the subject of numerous disciplinary reports, including possession of contraband in a penal institution, aggravated disobedience, and sexual misconduct.
Victim impact testimony at trial was presented by the victim's brother-in-law and only living relative, and by four family friends who testified as to their personal and business relationships with the victim, *955 as well as the impact of the murder on the victim's widow, who died before the trial began.
Defendant did not testify at either phase of the trial. The defense presented nine witnesses at the penalty phase, including defendant's mother, aunt, coach, spiritual advisor, two counselors from the Blundon Home, a clinical neuropsychologist, and a prison board member. In mitigation, the defense argued that defendant, at the time of the offense, did not have the capacity to appreciate the criminality of his conduct because he was impaired by a mental disease or defect or intoxication. See La. Code Crim.Proc. art. 905.5(e). The defense presented evidence and argued that defendant's childhood home and neighborhood environment, along with the incident of sexual molestation, led to his adult criminal behavior.

1. Passion, Prejudice and Arbitrary Factors

There is no suggestion in the record that the jury's decision was based on passion, prejudice or any other arbitrary factor.
Pretrial publicity did not influence the jury's decision. At a pretrial hearing on a motion for change of venue, eight newspaper articles about the crime were presented, but the court found that the publicity surrounding the four-year-old murder was not so widespread as to merit changing venue.
Although defendant was an African-American and his victim was a white male, race did not appear to be a factor in the proceedings. While defendant argues that numerous errors occurred during jury selection, these arguments were fully addressed above, and were found to lack merit. Consequently, no prejudice is perceived.
Defendant's contention that he was prejudiced by the introduction of other crimes evidence in the guilt phase of his trial was also addressed above and found to be without merit.

2. Aggravating Circumstances

The state relied on two aggravating circumstances under La.Crim.Proc. art. 905.4A, and the jury found that both were supported by the evidence: (1) the offender was engaged in the perpetration or attempted perpetration of an armed robbery; and (2) the offense was committed in an especially heinous, atrocious or cruel manner.[16]
The evidence clearly supported the finding that the murder was committed during the perpetration of an armed robbery.
As to the "especially heinous" aggravating circumstance, defendant argues that there was no evidence of torture or "pitiless infliction of unnecessary pain and suffering" accompanying the victim's death. Nevertheless, the failure of one aggravating circumstance does not require setting aside a capital sentence resting upon one or more other properly found aggravating circumstances, unless the evidence introduced to support the failed circumstance interjected an arbitrary factor into the proceedings. State v. Welcome, 458 So.2d 1235, 1245 (La.1983).
In this case, the evidence of the manner in which the offense was committed and of the nature of the victim's injuries was relevant and properly admitted in the guilt stage. Thus, reintroduction of that evidence at the penalty phase did not interject an arbitrary factor into the proceeding. *956 See La.Code Crim.Proc. art. 905.2A ("The jury may consider [at sentencing] any evidence offered at the trial on the issue of guilt.").

3. Proportionality Review

Although the federal Constitution does not require proportionality review, Pulley v. Harris, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984), comparative proportionality review remains a relevant consideration in determining the issue of excessiveness in Louisiana. State v. Wille, 559 So.2d 1321 (La.1990). This court, however, has set aside only one death penalty as disproportionately excessive under the post 1976 statutes, finding in that one case, inter alia, a sufficiently "large number of persuasive mitigating factors." State v. Sonnier, 380 So.2d 1, 9 (La.1979).
This court reviews death sentences to determine whether the sentence is disproportionate to the penalty imposed in other cases, considering both the offense and the offender. If the jury's recommendation of death is inconsistent with sentences imposed in similar cases in the same jurisdiction, an inference of arbitrariness arises. Sonnier, supra.
Since 1976, jurors in the Nineteenth Judicial District Court have recommended imposition of the death penalty on approximately twenty-two occasions, including the current case. Several of the salient features of the instant case make it similar enough to other death sentences recommended by juries in the district that defendant's sentence is not disproportionate. See, e.g., State v. Tilley, 99-0569 (La.7/6/00), 767 So.2d 6 (defendant killed a sixty-eight-year-old man by repeatedly stabbing him during the course of an armed robbery in the parking lot of a restaurant); State v. Frost, 97-1771 (La.12/1/98), 727 So.2d 417 (defendant, a hotel employee, stabbed the night auditor to death and stole the contents of the cash box); State v. Robertson, 92-2660 (La.1/14/94), 630 So.2d 1278 (defendant broke into the victims' home, armed himself with a kitchen knife, and stabbed the two elderly victims to death) (convictions reversed and sentences vacated; trial court erred in failing to sustain defendant's challenge for cause to an objectionable juror); State v. Robertson, 97-0177 (La.3/4/98), 712 So.2d 8 (convictions and sentences affirmed), cert. denied, Robertson v. Louisiana, 525 U.S. 882, 119 S.Ct. 190, 142 L.Ed.2d 155 (1998); State v. Williams, 383 So.2d 369 (La.1980) (defendant shot and killed the victim during an armed robbery of a grocery store).
Furthermore, since this court has affirmed numerous capital sentences based primarily on the jury's finding that the defendant killed the victim in the course of an armed robbery, the sentence of death is not disproportionate in this case. See, e.g., State v. Wessinger, 98-1234 (La.5/28/99), 736 So.2d 162, cert. denied, Wessinger v. Louisiana, 528 U.S. 1050, 120 S.Ct. 589, 145 L.Ed.2d 489 (1999); State v. Broadway, 96-2659 (La.10/19/99), 753 So.2d 801, cert. denied, Broadway v. Louisiana, 529 U.S. 1056, 120 S.Ct. 1562, 146 L.Ed.2d 466 (2000); State v. Brumfield, 96-2667 (La.10/20/98), 737 So.2d 660, cert. denied, Brumfield v. Louisiana, 526 U.S. 1025, 119 S.Ct. 1267, 143 L.Ed.2d 362; State v. Williams, 96-1023 (La.1/21/98), 708 So.2d 703, cert. denied, Williams v. Louisiana, 525 U.S. 838, 119 S.Ct. 99, 142 L.Ed.2d 79 (1998); State v. Taylor, 93-2201 (La.2/28/96), 669 So.2d 364, cert. denied, Taylor v. Louisiana, 519 U.S. 860, 117 S.Ct. 162, 136 L.Ed.2d 106 (1996); State v. Scales, 93-2003 (La.5/22/95), 655 So.2d 1326, cert. denied, Scales v. Louisiana, 516 U.S. 1050, 116 S.Ct. 716, 133 L.Ed.2d 670 (1996); State v. Craig, 95-2499 (La.5/20/97), 699 So.2d 865, cert. denied, *957 Craig v. Louisiana, 522 U.S. 935, 118 S.Ct. 343, 139 L.Ed.2d 266 (1997).

Decree
For the reasons assigned herein, defendant's conviction and sentence are affirmed. In the event this judgment becomes final on direct review when either: (1) defendant fails to petition timely the United States Supreme Court for certiorari; or (2) that Court denies his petition for certiorari; and either, (a) the defendant, having filed for and been denied certiorari, fails to petition the United States Supreme Court timely, under its prevailing rules, for rehearing of denial of certiorari; or (b) that Court denies his petition for rehearing, the trial judge shall, upon receiving notice from this court under La.Code Crim.Proc. art. 923 of finality on direct appeal, and before signing the warrant of execution, as provided by La.Rev.Stat. 15:567B, immediately notify the Louisiana Indigent Defense Assistance Board and provide the Board with reasonable time in which: (1) to enroll counsel to represent the defendant in any state post-conviction proceedings, if appropriate, pursuant to its authority under La.Rev.Stat. 15:149.1; and (2) to litigate expeditiously the claims raised in that original application, if filed, in the state courts.
JOHNSON, J., dissents and assigns reasons.
JOHNSON, J., dissenting.
I am troubled by this decision which allows the state to exercise peremptory challenges to exclude African-Americans from the jury. I believe that by doing so, the state has deprived this defendant of his right to a trial by a jury of his peers which is guaranteed by the Sixth Amendment to the United States Constitution.
In this case, the prosecutor used his first four peremptory challenges to exclude four African-American prospective jurors. In my mind, this clearly gave rise to an inference of discrimination. Pursuant to Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the prosecutor was then required to articulate a race-neutral explanation for striking the African-American jurors.
The trial judge accepted the prosecutor's explanation for striking one of the prospective jurors based upon her inattentiveness and because the prosecutor believed the juror was "very weak on the death penalty." The majority, giving deference to the trial judge's decision, found no abuse of discretion. However, the trial judge then allowed the prosecutor to escape his duty to provide a race-neutral explanation for striking the other three prospective jurors with the excuse that "he did not have his notes in court regarding the other three." Op. at 939.
The majority of this court compounded the trial court's error by reviewing the jury questionnaires of the four African-American prospective jurors and ultimately providing a litany of purely speculative reasons on the prosecutor's behalf. Without an evidentiary hearing regarding the prosecutor's reasons, it is impossible to determine whether those reasons were race neutral.
Moreover, as the majority recognizes, this case is similar to State v. Snyder, 98-1078 (La.4/14/99), 750 So.2d 832. In that case, the prosecutor accepted one African-American juror, but used peremptory challenges to exclude four others. Subsequently, the prosecutor exercised a peremptory challenge to "back-strike" the sole African-American that he had initially accepted, resulting in an all white jury. Although defense counsel did not initially object to the prosecutor's use of its peremptory challenges to strike three of the prospective jurors, he noted their race for *958 the record. This court held that by failing to object properly, the defendant waived any claim under Batson.
In this case, the majority discussed the holding in Snyder, but circumvented the problem of fashioning a remedy for cases where the defendant raises a Batson objection to jurors who have been previously excused before the jury is impaneled. The court should use this opportunity to repudiate the holding in Snyder. Since we allow parties to use peremptory challenges to "back-strike" jurors pursuant to LSA-C.Cr.P. art. 795, we must allow criminal defendants to assert a Batson objection to previously excused jurors. It is impossible to see the pattern of racial discrimination until after several African-Americans have been excluded. The prosecution should be required to provide a race-neutral reason for each peremptory challenge.
Accordingly, I would remand this case to the trial court for an evidentiary hearing to determine the prosecutor's reasons for using peremptory challenges to strike the first three African-American jurors.

On Rehearing
PER CURIAM:
In our opinion on original hearing we did not expressly resolve the question of whether defense counsel had preserved his Batson complaint by timely objection because the trial judge found in any event that counsel had failed to establish a prima facie case of purposeful discrimination, the first step in equal protection analysis under Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). The court made that ruling in the context of finding that the prosecutor had articulated an acceptable race-neutral reason for excluding Stacy Thomas, the fourth African-American venireperson excused by the state. The trial judge stated for the record that he had given the prosecutor an opportunity to offer an explanation for his challenge to Ms. Thomas "while it is fresh in his mind," in response to the defense Batson objection. However, the court also cautioned that it "[did] not find there is a prima facie case supporting the objection made by the defense in this case." The judge specifically noted for the record that he had been "satisfied on each of the challenges that there was a racially neutral reason based upon the record and answers from the prospective jurors during voir dire examination."
No formula exists for determining whether the defense has established a prima facie case of purposeful racial discrimination. A trial judge may take into account not only whether a pattern of strikes against African-American venirepersons has emerged during voir dire but also whether "`the prosecutor's questions and statements during voir dire examination and in exercising his challenges may support or refute an inference of discriminatory purpose.'" State v. Myers, 99-1803, p. 5 (La.4/11/00), 761 So.2d 498, 502 (quoting Batson, 476 U.S. at 97, 106 S.Ct. at 1723). Batson accords a trial court considerable flexibility and broad discretion in this regard because "trial judges, experienced in supervising voir dire, will be able to decide if circumstances concerning a prosecutor's use of peremptory challenges creates a prima facie case of discrimination against black jurors." Batson, 476 U.S. at 97, 106 S.Ct. at 1723.
In the present case, the trial judge found on the basis of his personal observation of voir dire examination that the answers of the prospective jurors, and not discriminatory intent, explained the prosecutor's exercise of his first three peremptory challenges to exclude African Americans from the jury. In our opinion on original hearing, we essentially found *959 no abuse of the trial court's discretion because the attitudes expressed by the jurors towards capital punishment and their relationships with family members who were incarcerated made them entirely predictable targets of state peremptory challenges for specific, objective, and trialrelated reasons other than race.
Thereafter, beginning with Ms. Thomas, the trial court rendered moot the question of whether defense counsel had established a prima facie case of discrimination with each successive state peremptory challenge against African Americans i.e., whether a significant pattern of strikes had finally emerged, when it asked the prosecutor to articulate race-neutral reasons for excluding the juror and the prosecutor responded by volunteering his reasons. Hernandez v. New York, 500 U.S. 352, 359, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395 (1991) ("Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot."). As noted on original hearing, we found no abuse of the court's broad discretion in accepting those reasons as sufficient to negate any inference of discriminatory intent. Under these circumstances, the record "does not leave us with a definite and firm conviction that a mistake has been committed." Hernandez, 500 U.S. at 370, 111 S.Ct. at 1872 (internal quotation marks and citation omitted).
Accordingly, the application for rehearing is denied.
LEMMON, J., dissents from the denial of the application for rehearing and assigns reasons.
JOHNSON, J., would grant the rehearing.
LEMMON, J., Dissenting from the Denial of the Application for Rehearing.
On application for rehearing, defendant is correct that the trial judge erred in ruling that the Batson objection was untimely as to the first three black jurors struck by the prosecutor's peremptory challenges. The objections were made timely before the entire jury was sworn.
The application for rehearing is also correct that this court's opinion on original hearing improperly questioned the ability of the trial judge to fashion a remedy if the judge had found the defense established a prima facie case and the judge had required and rejected race-neutral reasons. The remedy of disallowing the challenges and reinstating the improperly challenged jurors was not available to the trial judge when the first Batson objection was made. However, if the judge had required race-neutral explanations and rejected them, he could have invoked the alternative remedy of discharging the entire panel and selecting a new jury from a different venire. Batson v. Kentucky, 476 U.S. 79, 99 n. 24, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).
The majority of this court nevertheless rejects the rehearing application on the basis that the trial judge properly found that the defense did not establish a prima facie case of discrimination. At the point that the defense entered the first Batson objection, the prosecutor had struck all four black prospective jurors (one of whom was backstruck).[1] These bare statistics *960 raise a significant inference of discrimination that requires rebuttal.[2]
The better procedure would have been for the trial judge to require the prosecutor to explain on the record, in the second Batson step, why this statistical evidence did not indicate racial discrimination, and then perform the third Batson step of accepting or rejecting, on the entire record, the reasons proffered by the prosecutor. Under the procedure approved by this court, the trial judge relieved the prosecutor of the burden of explaining why he struck four consecutive blacks from the venire and effectively telescoped the three-step Batson procedure into one step, without involving the prosecutor whose intention was at issue.
While the majority might be correct as a pure question of law, the fairness of the procedure approved by the majority is questionable in a system that already places almost unlimited discretion in the trial judge in accepting or rejecting a prosecutor's race-neutral reasons for challenges. To insure fairness, I would grant rehearing in part and remand the case to the trial court to conduct a hearing for the purpose of requiring the prosecutor to offer race-neutral reasons for challenging prospective jurors Eaglin, Miller and Garrett, and of ruling on the proffered reasons.
NOTES
[1] Defendant's other assignments of error involve only settled principles of law and are treated in an unpublished appendix, which is attached to this opinion and is part of the official record.
[2] The next morning, two persons in the area of the chase found a wallet that contained a driver's license, credit cards, and papers bearing the victim's name and address.
[3] Davis was arrested three months later on a charge of first degree murder. The grand jury indicted him as an accessory after the fact of the first degree murder.
[4] Ultimately, the jury was composed of one African-American male, one Asian-American male, six white males and four white females. Both alternates were African-American females.
[5] "[T]he mere presence of blacks on a jury does not necessarily defeat a Batson claim." Collier, 553 So.2d at 819.
[6] The fifth peremptory challenge was exercised against a white juror.
[7] The critical factor here is the age of Moton's only child. Defendant tries to draw a distinction in the prosecutor's treatment of Moton and other white prospective jurors who seemed equally willing to "abandon" their children during sequestration. However, none of the examples cited in defendant's brief involved children of such tender age.
[8] Prior to oral argument, this court referred the motion to the merits of the appeal.
[9] The charge against Davis was dismissed on speedy trial grounds after defendant's conviction.
[10] Defendant filed in this court an affidavit executed by Bienville Davis on October 27, 2000, in which Davis claims that the murder was committed by Sherman Reed, a man Davis knew but had not seen for about twelve years. During oral argument, defense counsel informed this court that Reed is now deceased.
[11] At the time of trial, Davis was incarcerated on charges of shooting at a man who was visiting his ex-wife.
[12] The victim's receipt found with money in defendant's pocket at his arrest was especially damning. Moreover, while the two restaurant employees disagreed about the hair style of the blue Cadillac's driver, possibly suggesting that the witnesses may have been describing different men and that the Cadillac had a total of three occupants, Davis acknowledged in his affidavit that he was the driver of the Cadillac. The employees therefore were describing the same man, although arguably differing as to his physical appearance.
[13] A review of the photographs taken of defendant immediately after the chase and on the scene of his arrest confirms how witnesses could easily have described his attire as "all dark clothing."
[14] Defendant concedes in his brief that "[t]he police records that counsel have obtained do not establish the precise time Verrett returned to the 17th and Wisteria scene." Since this critical time is not established, the report has little value to defendant's argument.
[15] The standard for determining a defendant's connexity with the other prior crimes, i.e., by a preponderance of the evidence or by clear and convincing evidence, for purposes of determining admissibility of other crimes evidence, remains an open question in this court. See La. Code Evid. art. 1104.
[16] At the time of the instant offense, the victim's age of sixty-five or older was not considered an aggravating circumstance.
[1] The prosecutor offered reasons for striking the fourth black juror, and the judge, without ruling on whether there was a prima facie case, accepted these reasons. However, the prosecutor did not offer reasons for striking the first three because the prosecutor did not have his notes in court with him at the time. The judge then stated he would not require reasons because the defense had not established a prima facie case.
[2] The prosecutor ultimately struck nine of eleven blacks in the qualified venire. One black was struck by the defense, and one served on the jury. The prosecutor also used his two alternate peremptory challenges to remove blacks.