11 COOKS, Judge.
Defendant appeals his second degree murder conviction. For the following reasons, we affirm.
FACTS
On December 8, 1999, Defendant, Jason Leopold, and Anthony Pierson were riding with Shane Hopkins in his car in Lafayette Parish. At trial, Defendant testified he thought they were going to meet some women, but the foursome instead traveled to Larribee Pit Road, a dark and secluded area, and stopped. All four men exited the car. Apparently, there was a plan afoot to rob a nearby house. At trial, Leopold, Pierson, and Defendant gave different versions of who wanted to rob the house and who did not.
According to Leopold and Pierson, they walked down the road ahead of Hopkins and Defendant. They heard a gunshot and turned around to see Defendant standing near the fallen Hopkins. Defendant then fired a second, downward shot at the *1224 prostrate Hopkins. Medical evidence at trial revealed Hopkins died because one of the bullets entered his brain. The other lodged in his neck. After the shooting, Defendant and the other two men moved the corpse to a nearby wooded area and drove away.
Defendant was charged by bill of indictment with second degree murder in violation of La.R.S. 14:30.1. After a three day jury trial, Defendant was found guilty as charged. Defendant filed a Motion for Post Verdict Judgment of Acquittal. After hearing arguments, the trial court denied the motion and sentenced Defendant to serve a mandatory life imprisonment term. Defendant appeals his conviction, assigning four errors.
ASSIGNMENT OF ERROR NO. 4
We elect to address Defendant’s fourth assignment which challenges the Insufficiency of the evidence first, pursuant to Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).
As we previously explained:
When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, rehearing denied, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979); State ex rel. Graffagnino v. King, 436 So.2d 559 (La.1983); State v. Duncan, 420 So.2d 1105 (La.1982); State v. Moody, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the Jackson standard of review. See State ex rel. Graffagnino, 436 So.2d 559 (citing State v. Richardson, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.
State v. Kennerson, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97); 695 So.2d 1367, 1371, appeal after remand, 97-1682 (La.App. 3 Cir. 6/3/98); 715 So.2d 518. (Emphasis added).
The elements of second degree murder are codified in La.R.S. 14:30.1, which states, in pertinent part:
A. Second degree murder is the killing of a human being:
(1) When the offender has a specific intent to kill or to inflict great bodily harm; ...
The State’s case in brief primarily rested on Defendant’s statement to police. In a videotaped statement to police, Defendant said on the evening of the offense, Jason Leopold came to his house and woke him up. Leopold asked him to join in a robbery, but Defendant replied he did not want to do so. Defendant, who was drunk, then convinced Leopold to take him to the store. When they got into Leopold’s car, Shane Hopkins and two other men were already in it. In Defendant’s statement, it is not clear what the five men did next, although they apparently went to the store, then |3drove to Broussard and back. Later, Leopold dropped off Hopkins, who drove his own vehicle back to Leopold’s residence and picked him up, along with Defendant and “another guy,” later identified as “Anthony.”
*1225 According to Defendant’s statement, the foursome proceeded to a gravel road and parked, because the other men wanted to rob a nearby house. For reasons not clear in the statement, Defendant was in possession of a gun that belonged to Leopold. Upon Leopold’s instruction, Defendant handed him the gun. Leopold cocked it, then gave it back to Defendant. The four men then exited the car, with Hopkins behind Defendant. Hopkins stepped'past him and said something, startling him. Defendant then stated he shot Hopkins. He also shot him a second time; although in his confession, he claimed to be unsure about firing the second shot. He stated they then moved the body into a ditch.
Defendant told police that Leopold stole stereo equipment out of Hopkins’s car, then “ditched” the ear in a nearby river. Defendant stated he gave the gun back to Leopold, but did not know what happened to it after that. The third man, Anthony, was not with them when they disposed of the car. Apparently, he had already been dropped off by the other men. Defendant was vague regarding this point in his statement.
At trial, Anthony Pierson testified when the foursome arrived at Larribee Pit Road, he and Leopold exited the car and began walking down the road side by side,*with Hopkins and Defendant behind them. Pierson testified there was no talking at this point. Then, he heard a gunshot, and turned to see Defendant standing near the prostrate Hopkins. Defendant then fired a second shot downward. The remaining three men then put the corpse “up on the hill” and left. According to Pierson, they left the scene in Hopkins’ car, with Defendant driving. Leopold and Defendant dropped off Pierson, and he had no more contact with them that evening.
|4Leopold also testified for the State. He stated that on December 8, 1999, he was “hanging out” with Anthony Pierson during the day. At approximately 7:30 p.m., he met with Shane Hopkins, and at approximately 8:00 p.m., he met with Defendant. By this time, all four, along with an unnamed fifth man, were in Leopold’s car, riding around. After approximately fifteen minutes of riding, Hopkins proposed burglarizing an auto sound shop in Broussard. However, when they arrived at the shop, Defendant refused to participate. They then returned to Lafayette, and went to Leopold’s house. Then, they proceeded to Hopkins’ house and dropped off both him and the unnamed fifth man.
Approximately twenty minutes later, Hopkins arrived back at Leopold’s house, driving his own car. The remaining four men — Leopold, Hopkins, Defendant, and Pierson — then departed together in Hopkins’ car, supposedly to go to a house and meet some women. According to Leopold, Defendant suggested going to Larribee Pit Road to burglarize a house. They parked and exited the car. Leopold testified at that point Hopkins had a gun. Upon exiting, Defendant somehow came to possess the weapon, but Leopold did not know how the transfer took place. The four then began walking down the road, with Leopold and Pierson in front, and the other two behind them. Defendant and Hopkins were side by side, according to Leopold. The witness testified he heard a gunshot, and turned to see Hopkins lying on the ground. Defendant then fired a second shot at Hopkins. On Defendant’s orders, they then moved the body to a “hill or levee.” Using the victim’s vehicle, Defendant then drove the other two men to Leopold’s residence and dropped them off.
About twenty minutes later, Leopold saw the vehicle going down a local street *1226 and proceeded in the same direction, because he wanted to see what Defendant would do next. He denied helping Defendant put the car in the river.
The State’s medical expert, Dr. Emil Laga, testified that Hopkins was shot Istwice. The fatal bullet killed him because it went through his brain. The other, nonfatal, bullet lodged in his neck. The fatal bullet’s trajectory was consistent with a gunshot from a point more than two feet behind the victim; the other bullet’s trajectory was consistent with a shot fired at the victim while he lay face-up. The investigating detective, John Babin, acknowledged that the murder weapon was never recovered.
We find the evidence is sufficient to support the conviction. Although Defendant intimated in his confession that the shooting was accidental, jurors could reasonably have inferred that the killing was intentional. The fact that Defendant shot the prone Hopkins a second time, is a strong indication the killing was intentional.
The essence of Defendant’s argument is that the State’s witnesses were not credible. It is well-settled that credibility determinations are within the purview of the fact-finder. State v. Hampton, 98-0331 (La.4/23/99); 750 So.2d 867, cert. denied, 528 U.S. 1007, 120 S.Ct. 504, 145 L.Ed.2d 390 (1999); State v. Brown, 2000-1021 (La.App. 3 Cir. 1/31/01); 780 So.2d 536. However, we will address the alleged inconsistencies in the order they were presented by Defendant.
First, he emphasizes that Leopold repeatedly denied ever owning or possessing a handgun. Defendant’s brief does not explain how this denial affected Leopold’s credibility. Defendant and several Defense witnesses testified that Leopold owned a handgun. At trial, Defendant recanted the admissions in his statement, and named Leopold as the killer. Defendant claimed Leopold carried a gun on a regular basis, possessed it on the night of the shooting, and shot Hopkins with it. Anthony Pierson also testified Leopold possessed a pistol on the night of the offense, and that he had seen Leopold with the pistol on previous occasions.
Defendant also notes that Leopold admitted he lied to police during the investigation. Pierson also admitted in open court that he lied to police during the investigation. Each man said he was scared when initially questioned. Defendant | (¡makes note of Pierson’s claim that nobody talked before the shooting, and that he did not know why they were on Larribee Pit Road. Defendant also points out that Pierson testified he could not remember the time interval between the first and second shot. The first point, like others raised by Defendant, was a credibility factor for the jury to assess. Regarding the time-interval between gunshots, Pier-son’s lack of recollection is not a fact that seriously calls Pierson’s credibility into question. Further, it would not have been unreasonable for the jury to conclude that fear or shock affected a witness’ memory of the event.
The State’s two eyewitnesses also disagreed about other matters. Leopold testified, after the shooting and placement of the corpse in the nearby woods, Defendant dropped off the other two men at Leopold’s apartment. On the other hand, Pierson testified Defendant and Leopold dropped him off at Leopold’s apartment, but Leopold and Defendant remained tor gether.
Besides noting the inconsistencies detailed above, Defendant also notes trial *1227 testimony from Defense witnesses that directly implicated Jason Leopold as the killer. Defendant presented the testimony of Stella Leopold Ledet, who is Jason Leopold’s sister and Defendant’s mother. She stated that, at a party prior to the offense, Leopold stated he did not like Hopkins, and wanted to kill him. Defense witness Dion Leopold testified she once heard Jason Leopold ask his girlfriend if he could “get away with” killing Hopkins. Inmate Justin Alex testified Leopold once told him he had shot somebody.
We do not find Defendant’s arguments merit setting aside his conviction. As noted at the outset of this analysis, the jurisprudence holds that credibility of the witnesses is a matter for the jury, and not to be second-guessed by the appellate court.
This court has set aside a jury verdict in a case in which witness credibility was extremely questionable. In State v. Bourque, 94-291 (La.App. 3 Cir. 11/2/94); 649 So.2d 670, this court set aside the defendant’s conviction because the two state eyewitnesses were clearly unreliable. One of them was a young black boy who testified that all white men looked alike (the defendant was a white man), and the other witness admitted to having consumed a significant amount of alcohol before the incident at issue. Thus, the witnesses in Bourque impeached themselves, and did so in ways that were clear in the record. The witnesses’ responses in that case called into question their capacities to reliably perceive the events they claimed to have witnessed. As this court concluded, it was simply not reasonable for the jury to convict Bourque based upon the testimony of such inherently unreliable witnesses.
The witnesses in the present case do not demonstrate the inherent unreliability of the witnesses in Bourque. Here, there is no question regarding the witnesses’ abilities to perceive events. The allegation in this case is that the two eyewitnesses were lying, as part of a plan to “frame” Defendant. This is the sort of credibility question that falls squarely within the province of the fact-finder. The jury is in a better position to resolve the conflicting evidence, as they can directly observe the witnesses.
Also, regarding the witnesses who testified that Jason Leopold hated Hopkins and expressed a desire to kill him, the jury could have believed this testimony and still have reasonably concluded that Defendant was the killer. Even if Leopold made such statements at various times before the offense, they would not negate either Defendant’s statement, or Pierson’s corroborating testimony.
At trial, Defendant took the stand and tried to explain his confession as an attempt to shield Leopold. As with the other testimony discussed, the credibility assessment for such a claim was for the jury. Arguably, Defendant’s explanation of why he confessed to shooting a man to death was more unreasonable than the testimony of the two eyewitnesses. The State presented the jury with a confession to [sthe shooting, two eyewitnesses, and a dead victim whose body was damaged in a manner medically consistent with the scenario presented by the eyewitnesses. Thus, the evidence in this case was sufficient to support the conviction.[1]
ASSIGNMENT OF ERROR NO. 1
Defendant also argues his trial counsel was ineffective for failing to file a motion *1228 to suppress, or a motion for discovery. This court has explained the test for ineffective assistance of counsel:
A defendant is entitled to effective assistance of counsel as guaranteed by the Sixth Amendment to the United States Constitution and Article I, § 13 of the Louisiana Constitution of 1974. This right is fundamental to our system of justice and a cornerstone in assuring that defendants receive a fair trial not unduly prejudiced by their counsel’s ineffective assistance. “Effective counsel” has been defined to mean “not errorless counsel”, and not counsel judged ineffective by hindsight, but counsel likely to render reasonably effective assistance. State v. Ratcliff, 416 So.2d 528, 531 (La.1982)(quoting United States v. Fruge, 495 F.2d 557, 558 (5 Cir.1974)). The claim is assessed by the two-part test enunciated in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); Id. To prevail, the defendant must not only show that counsel’s performance was deficient, but also that a reasonable probability existed that he was prejudiced by the deficiency. Brooks, 661 So.2d 1333. “A reasonable probability is a probability sufficient to undermine confidence in the outcome.” Strickland, 466 U.S. at 694, 104 S.Ct. at 2068.
State v. Antoine, 00-564, p. 6 (La.App. 3 Cir. 12/6/00); 774 So.2d 353, 357.
As Defendant observes, ineffective assistance is normally raised in post-conviction proceedings. However, it may be raised on direct appeal if the record contains sufficient evidence to decide the claim. State v. Seiss, 428 So.2d 444 (La.1983).
In regard to the lack of a discovery motion, the State asserts it has a standing agreement with the attorney in question, to provide him with open-file discovery. _J^Regarding the lack of a motion to suppress, the State notes the court held a contradictory hearing on its Notice of Intent to Use an Inculpatory statement. The State asserts the hearing served the function of a motion to suppress, because if the State had failed to carry its burden at the hearing, the statement would have been suppressed.
A standard practice of open-file discovery, by its very nature, involves facts outside the record. Thus, there is nothing for this court to review. As for the suppression issue, Defendant does not clearly argue what should have been suppressed, although the heading of his assignment refers to his “statements or confessions.” The record indicates the lower court held a thorough contradictory hearing which addressed the suppression issue. Thus, the issue of whether Defendant’s statement should have been suppressed was fully addressed in the court below. Pursuant to Strickland, Defendant fails to meet either prong of the ineffectiveness analysis on this issue.
ASSIGNMENT OF ERROR NO. 2
In his second assignment, Defendant argues his trial counsel was ineffective for failing to request a special jury instruction regarding the testimony of his two alleged accomplices, Jason Leopold and Anthony Pierson. The State’s brief does not contain a counter-argument on this issue. Since this assignment alleges ineffective assistance of counsel, it should be analyzed under the Strickland two-part test. The first question is whether counsel *1229 performed deficiently, by failing to request a jury instruction.
Regarding the potential jury instruction, our brethren on the Fifth Circuit have stated: “While the testimony of a co-defendant in a crime should be received with a great deal of caution, a jury or judge may nonetheless convict on this testimony if it is deemed sufficient. State v. May, 339 So.2d 764, 775 (La.1976).” State v. Addison, 00-1730, p. 8 (La.App 5 Cir. 5/16/01); 788 So.2d 608, 614. The footnote to this | mpassage elaborates:
See also: State v. Howard, 98-0064 (La.4/23/99), 751 So.2d 783, 801, quoting State v. Schaffner, 398 So.2d 1032, 1035 (La.1981), where it was held that when the state’s case turns upon the uncorroborated testimony of an accomplice, the trial judge should instruct the jury to treat such testimony with great caution. However, when the accomplice’s testimony is corroborated by other evidence, such language is not required.
Id. at 614, n. 4.
The accomplice-testimony in the present case was corroborated. Each man’s testimony was corroborated by the other’s, and by Defendant’s own statement to police. Also, the physical evidence, i.e., the bullet wounds in the victim’s corpse, were consistent with the version of events related by Leopold and Pierson, and by Defendant’s confession. Thus, trial counsel lacked a valid legal basis for requesting a jury instruction. Therefore, his performance cannot be logically characterized as deficient, under the first prong of Strickland.
ASSIGNMENT OF ERROR NO. 3
Defendant next argues the trial court erred by allowing the State to improperly exclude African-Americans from the jury. See Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).
The supreme court has recently discussed the structure of the Batson analysis:
Under Batson, a defendant objecting to a peremptory challenge must first establish a prima facie case of discrimination by showing facts and relevant circumstances which raise an inference that the prosecutor used the challenges to exclude potential jurors on account of race. The burden of production then shifts to the prosecutor to come forward with a race-neutral explanation for the challenges. The explanation need not be persuasive, or even plausible, and unless a discriminatory intent is inherent in the prosecutor’s explanation, the reason offered may be deemed race-neutral. Purkett v. Elem, 515 [514] U.S. 765, 767[, 115 S.Ct. 1769, 131 L.Ed.2d 834] (1995)(per curiam) Burkett, supra. The trial court then must decide whether the defendant has proved purposeful racial discrimination. State v. Collier, 553 So.2d 815, 818 (La.1989). The ultimate burden of persuasion remains on the defendant to prove purposeful discrimination. Id.; Hernandez v. New York, 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991).
State v. Jacobs, 99-0991, p. 3 (La.5/15/01); 803 So.2d 933.
The court also stated:
A trial judge may therefore effectively collapse the first two stages of the Bat-son procedure, whether or not the defendant established a prima facie case of purposeful discrimination, and may then perform the critical third step of weighing the defendant’s proof and the prosecutor’s race-neutral reasons to determine discriminatory intent.

Id.

The first two steps were apparently collapsed in the present case, as shown by the following colloquy:
*1230 MR. GALLASPY: Judge, I must urge a Batson challenge at this time. I think the last three that were peremptorily excused by the State were all black jurors.
MR. LANDRY: That’s correct, Your Honor, and I will be happy to respond.
THE COURT: All right.
MR. LANDRY: The first juror that the State — well, I would like the record to reflect that the State has already accepted two black females and a black male, Mr. Domingue, who was struck by Mr. Gallaspy. The first challenge that we exercised was Ms. Cathy Davis. She that she has been involved with Aeadia-na Legal Services. [Sic.] In addition, she did indicate that she was arrested for a simple battery which occurred as recently as 90 days ago; and as such, because of her involvement in the criminal justice system, we don’t think she is appropriate.
As to Ms. Donnelle Cormier, she is an eighteen-year-old and has indicated in earlier questioning that she knew one of the defense witnesses, and in fact had gone to school with her, and was questioned by me concerning who she would believe, due to the fact that she knew them.
The third individual was Mr. Lester Roy. We had already challenged Mr. Roy for cause, which the Court denied. He indicated, when he was questioned by the State, that he would hold us to all possible doubt. In addition, he may have had a family member that was convicted before.
MR. GALLASPY: In response, Judge, he had also asked |12Mr. Jones the same questions about proof beyond all possible doubt, and the State did not challenge Mr. Jones on that race-neutral criteria, and Mr. Jones is white.
THE COURT: All right, I am going to deny your challenge, Mr. Gallaspy.
MR. GALLASPY: I understand, Judge. I just need to make a record.
THE COURT: That’s fine, and we will note your objection.
Soon after, another brief Batson colloquy occurred between the court and the parties:
MR. LANDRY: For the record, Judge, please note another Batson challenge. Ms. Handy is black.
THE COURT: All right.
MR. LANDRY: And for the record, Ms. Handy, when questioned, indicated that she had recently been in a fight and was called on as a witness in a fight. So because of that, and also the fact that she is 22 years old, we are excusing her.
THE COURT: All right. I will deny your challenge and will note your objection to the ruling of the Court.
MR. GALLASPY: Yes, Your Honor.
Defendant’s made one other Batson challenge, which was discussed in greater detail:
MR. GALLASPY: And note for the record, Judge, that this peremptory challenge exercised by the State with respect to Ms. Lawrence, who is black, seems to follow the pattern.
MR. LANDRY: Judge, in response to that, Ms. Lawrence was questioned, and she indicated that her brother was convicted of an armed robbery in Lafayette Parish that was prosecuted by the Lafayette Parish District Attorney’s Office.
MR. GALLASPY: Judge, simply because the black people on this jury veni- *1231 re may have had more involvement with the District Attorney’s Office or the criminal justice system, that does not exclude them from being candidates for service. The whole point of having people from a cross-section of the community is to bring those types of experiences into the jury deliberation room. I think it’s pretty clear that the State has established a pattern.
| WTHE COURT: All right, I disagree, and I will note your objection to the ruling of the court.
From the colloquies cited, the first two parts of the analysis were combined by the court, and by both counsel. In each instance, the State immediately came forward with race-neutral reasons for excluding the potential jurors, without a separate initial determination that a prima facie pattern of discrimination had been shown. Regarding the reasons set forth by the State, we note language cited earlier from Jacobs, which stated that such reasons “need not be persuasive, or even plausible.” Id. The reasons given by the State in this case are plausible, in that they indicate logical, non-discriminatory reasons for the exclusion of each potential juror at issue.
A similar situation arose in State v. Neal, 00-0674, p. 8 (La.6/29/01); 796 So.2d 649, 656-57 wherein the supreme court reasoned:
As to Jurors Eckles and Hawkins, the trial court rendered the question of whether defense counsel had established a prima facie case of discrimination moot when it asked the prosecutor for his race-neutral reasons for qualifying the jurors. Hernandez, 500 U.S. at 359, 111 S.Ct. at 1866 (“Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot.”)
We find no error in the court’s ruling upholding the state’s use of its peremptory challenges of Jurors Eckles and Hawkins. It appears the state validly chose to strike Juror Eckles based on his reluctance regarding the state using the testimony of a co-perpetrator turned state’s witness. Because the state’s case against the defendant depended in large part on the jury believing Arthur Darby’s testimony, the state’s apprehension concerning Juror Eckles was understandable and was not race-based, and/or was race-neutral. As to Juror Hawkins, the state chose to strike him because he carried a bible, which the state evidently concluded (as the trial court did) to be a sign of the juror’s religious convictions and possible disinclination to impose the death penalty. Any response will qualify as race-neutral “unless a discriminatory intent is inherent in the prosecutor’s explanation.” Hernandez, supra, 500 U.S. at 364-66[, 111 S.Ct. 1859]. In this situation, besides telling the trial court to “note my objection,” the defendant did nothing to demonstrate that the state intended to discriminate against African American jurors or that the court abused its discretion when it accepted the state’s race-neutral explanations for its challenges. This assignment of error lacks merit.
Defendant argues, as he did below, that the excluded jurors’ experiences would |ube helpful in forming a jury made up of a cross-section of the community. He contends these experiences, such as involve *1232 ment with the criminal justice system, should be brought “into the jury deliberation room.” There may be an instance where the State’s deliberate exclusion of African Americans simply because of their marginal acquaintance with or distant familial relationship to individuals involved in the criminal justice system infringes on a defendant’s right to be tried by a jury selected from a cross section of the community. But this is not the case. The State’s reasons in the present case are comparable to those in Neal and were valid under Batson. Therefore, the assignment lacks merit.
DECREE
For the foregoing reasons, Defendant s conviction and sentence are affirmed.
AFFIRMED.

. Defendant also argues the State failed to exclude every reasonable hypothesis of innocence, pursuant to La.R.S. 15:438, “the circumstantial evidence rule.” However, this is not a circumstantial evidence case, as the *1228 State had two eyewitnesses, and an inculpato-ry statement from Defendant.